| | |
|---|---|
| BUFFALO LUMBER COMPANY, INC.<br><br>*Plaintiff*<br><br>V.<br><br>JANYLYN MARKS<br>*AND*<br>BUILT BY LOGIC, LLC<br><br>*Defendants* | Case No.<br><br><br>JURY DEMAND |

## VERIFIED COMPLAINT

Comes now the Plaintiff, Buffalo Lumber Company, Inc., and brings this lawsuit for violation of the Anti-cybersquatting Consumer Protection Act, breach of contract, breach of fiduciary duty, conversion, and tortious interference with a business, and for its *Complaint* against Janylyn Marks and Built by Logic, LLC, (collectively, the "*Defendants*") would show:

### PARTIES

1.  The Plaintiff, Buffalo Lumber Company, Inc., is a Nevada corporation, with its principal place of business located at 344 Southside Drive, McMinnville, Tennessee 37110, in the Eastern District of Tennessee.

2.  The Defendant, Janylyn Marks, ("*Defendant Marks*") is a resident of Oregon and was the Director of the Plaintiff's technical operations from 2005 until 2007, and then she was the President of Buffalo Lumber Company, Inc., from 2007 until her retirement in 2017. Upon her departure, Defendant Marks then provided IT services to the Plaintiff through her company and co-defendant, Built by Logic,

LLC. Defendant Marks is being served with a copy of this *Complaint* via service upon a duly authorized officer or agent for service of process.

3. The Co-Defendant, Built by Logic, LLC ("*Built by Logic*"), is an Oregon limited liability company, with its principal place of business located at 83406 Seaview Lane, Florence, Oregon 97439. Built by Logic provided IT services to the Plaintiff pursuant to a written subcontractor agreement. Built by Logic is being served with a copy of this *Complaint* via service upon a duly authorized officer or agent for service of process.

**JURISDICTION AND VENUE**

4. This civil action is brought pursuant to 15 U.S.C. § 1125(d), for violation of federally protected rights guaranteed to the Plaintiff by the Anti-cybersquatting Consumer Protection Act (the "*ACPA*"). This Court has subject matter jurisdiction over this claim pursuant to 28 U.S.C. § 1331, as this action is being filed under the laws of the United States.

5. This civil action is also brought for violations of the Plaintiff's rights under Tennessee law for:

(i) breach of contract,

(ii) breach of fiduciary duty,

(iii) conversion, and

(iv) tortious interference with a business.

This Court has subject matter jurisdiction over these claims pursuant to 28 U.S.C. §1332, as these claims involve a matter in controversy that exceeds the

sum or value of $75,000, exclusive of interest and costs, and are between citizens of different states.

6.  This Court has jurisdiction over the Plaintiff's claims for declaratory and injunctive relief pursuant to Fed. R. Civ. P. 57 and 65.

7.  This Court has personal jurisdiction over the Defendants pursuant to Fed. R. Civ. P. Rule 4(k), upon proper service of a summons pursuant to Fed. R. Civ. P. Rule 4(c) and (e). The Defendants are subject to the jurisdiction of the Eastern District of Tennessee because they have sufficient "minimum contacts with it such that maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'"[1] More specifically, the Defendants:

    (i)    transacted business within the Eastern District,

    (ii)   committed a tortious act within the Eastern District, and

    (iii)  entered into a contract for services to be rendered within the Eastern District.[2]

8.  This Court has in-rem jurisdiction over the Domain Names giving rise to this claim pursuant to 15 U.S.C. § 1125(d)(2)(C)(ii). The Plaintiff requests that upon receipt of written notification of a filed, stamped copy of this *Complaint* filed by the Plaintiff, the domain name registrar, domain name registry, or other domain name authority shall:

---

[1] International Shoe Co. v. State of Wash., Office of Unemployment Compensation and Placement, et al., 326 U.S. 310, *316 (1945) (quoting Miliken v. Meyer, 311 U.S. 457, 463 (1940).
[2] *See* T.C.A. § 20-2-214(a).

(i)    expeditiously deposit with this Court documents sufficient to establish this Court's control and authority regarding the disposition of the registration and use of the domain name to this Court; and

(ii)   not transfer, suspend, or otherwise modify the domain name during the pendency of this action, except upon order of this Court, pursuant to 15 U.S.C. § 1125(d)(2)(D)(i). Pursuant to 15 U.S.C. § 1125(d)(3), this in rem jurisdiction is in addition to any other jurisdiction that otherwise exists – whether in rem or in personam.

9.    Venue is proper in this Court because a substantial part of the events or omissions giving rise to the claim occurred within the Eastern District, and a substantial part of the property that is the subject of the action is situated in the Eastern District. For all venue purposes, the Plaintiff is deemed to reside only in the Eastern District, as it maintains its principal place of business here.[3]

### STATEMENT OF FACTS

10.   Buffalo Lumber Company, LLC (the "*Company*"), was founded in 2004 by David and Chris Buffaloe – father and son – with its headquarters and principal place of business located at 344 Southside Drive, McMinnville, Tennessee 37110.

11.   The Plaintiff was registered with both the Tennessee Secretary of State and the Nevada Secretary of State on February 14, 2005. Since that time, the Plaintiff has maintained its "active" registration status in Nevada, while its registration in Tennessee was administratively revoked on October 9, 2012. A copy of the

---

[3]  *See* 28 U.S.C. § 1391(c)(2)

relevant information regarding the Plaintiff's formation and registration – obtained directly from Nevada's Business Portal – is attached to this *Complaint* as Exhibit I.

12. Although the Plaintiff operates nationwide, it has maintained its principal place of business in McMinnville, Tennessee, since its founding. This location acts as the nerve center for the Plaintiff; where all corporate documents are stored, where all sales orders and payments are processed, and where its Co-Founder David Buffaloe has overseen operational decision-making.

13. On or about 2005, Defendant Marks was hired to provide technical expertise and support to the Plaintiff and to guide its transition from brick-and-mortar to an entirely online, e-commerce business model.

14. Initially, the Defendant was designated as a Director for the Plaintiff's technical staff, before becoming President of the Plaintiff in 2007.

15. Defendant Marks was designated as the President of the Plaintiff until February 28, 2017, when she retired and transferred her 42% ownership shares to Chris Buffaloe. Defendant Marks's retirement and ownership transfer are evidenced by meeting minutes from the annual meeting of the Plaintiff's board of directors for February 23, 2017, which are attached to this *Complaint* as Exhibit II and III.

16. During her time as the Director and then President, Defendant Marks exercised control over the creation and management of the Plaintiff's website and accompanying analytics, as well as its marketing and lead generation strategies.

17. The Plaintiff's online presence has become its primary means of generating sales and maintaining its relationships with customers.

18. On October 24, 2005, Defendant Marks personally registered the domain names: "www.buffalo-lumber.com" and "www.buffalolumber.com" (the "*Domain Names*") and designated herself up as the sole person with administrative access and control.

19. In fact, Defendant Marks designated herself as the sole administrator with access to and control over not just the Domain Names, but also the Plaintiff's website hosting and analytics platforms, and its advertising platforms.

20. Upon her retirement in February 2017, Defendant Marks formed her own company, Built by Logic, to provide information technology services.

21. Although, upon terminating her relationship with the Plaintiff, Defendant Marks never relinquished or transferred administrative access over the Domain Names, the Plaintiff's website hosting and analytics platforms, or its advertising platforms to the Plaintiff.

22. The Plaintiff ultimately hired Defendant Marks and Built by Logic in December 2017 to maintain its website and oversee its analytics, as well as its marketing and lead generation strategies.

23. To memorialize this relationship, Chris Buffaloe entered into a subcontractor agreement on December 14, 2017, with Defendant Marks and Built by Logic (the "*Subcontractor Agreement*"). A copy of this Subcontractor Agreement is attached to this *Complaint* as Exhibit IV.

24. Upon entering into this subcontractor relationship, Defendant Marks transferred access and control over the Domain Names, the Plaintiff's website hosting and analytics platforms, and its advertising platforms directly to Built by Logic.

25. The Plaintiff became unsatisfied with the services provided by Defendant Marks and Built by Logic and hired separate IT service providers as subcontractors to help maintain its technical operations.

26. Disputes arose between the Plaintiff's IT service providers, Defendant Marks, and Built by Logic concerning the Plaintiff's technical operations.

27. Defendant Marks began to leverage access to and control over the Domain Names, the Plaintiff's website hosting and analytics platforms, and its advertising platforms as a means of circumventing the opinion and authority of the Plaintiff's technical staff.

28. On October 20, 2021, Chris Buffaloe wrote to Defendant Marks and requested that she return access to and control over the Domain Names, the Plaintiff's website hosting and analytics platforms, and its advertising platforms so that the Plaintiff's technical staff could properly maintain its technical operations. A copy of this email is attached to this *Complaint* as Exhibit V.

29. On October 23, 2021, Defendant Marks responded to Chris Buffaloe's email by demanding payment and other consideration, and stating:

> I will agree to handing full control of website, analytics and adwords over to your team when the contract is signed, the down payment paid, the farm 100% in my name – this 2021 calendar year. The monthly payment term would start January 2022. It can extend beyond 2 years

as needed. Signing over the domains to BLC is contingent upon completion of the contract term.

A copy of this email is attached to this *Complaint* as Exhibit VI.

30. On November 15, 2021, Defendant Marks wrote again to Chris Buffaloe demanding payment from the Plaintiff in exchange for the return of access to and control over the Domain Names, the Plaintiff's website hosting and analytics platforms, and its advertising platforms.

31. On November 16, 2021, a subcontractor working on the Plaintiff's technical staff, Graham Miller, emailed Defendant Marks in attempt to gain access to the Domain Names and the Plaintiff's website hosting platform to implement key changes to the Plaintiff's website. A copy of this email is attached to this *Complaint* as Exhibit VII.

32. Defendant Marks responded to Graham Miller that same day, indicating the necessary passwords had been changed and she would prohibit the Plaintiff from accessing and controlling the Domain Names or the Plaintiff's website hosting platform until her demand for payment had been satisfied. A copy of this email is attached to this *Complaint* as Exhibit VIII.

33. In her November 16, 2021, email, Defendant Marks stated: "[w]hen that has been accomplished, control of website and domains will be released."

34. On November 29, 2021, another subcontractor on the Plaintiff's technical staff, Natalie Krul, sent a group email to Chris Buffaloe, Graham Miller, and Defendant Marks indicating that she could not gain access to the Domain Names and the Plaintiff's website hosting platform to implement key changes to the

Plaintiff's website. A copy of this email is attached to this *Complaint* as Exhibit IX.

35. In this November 29, 2021, email, Ms. Krul indicated that "[a]t this point, the only person with access to make the website edits is Janylyn."

36. On November 30, 2021, Defendant Marks responded to Natalie Krul and Chris Buffaloe, indicating that once the Defendant Marks's demands for payment had been satisfied, she would release control of the website to the Plaintiff. A copy of this email is attached to this *Complaint* as Exhibit X.

37. To date, Defendant Marks and Built by Logic retain sole access to and complete control over the Domain Names, the Plaintiff's website hosting and analytics platforms, and its advertising platforms and refuse to relinquish them.

38. More specifically, the Defendants are preventing the Plaintiff from accessing its Google Ads and Microsoft Ads accounts because the Defendant had sole administrative access. This prohibits the Plaintiff from adding additional advertisements or editing any existing ones or making any other necessary changes to improve ad account performance.

39. In fact, on December 17, 2021, the Defendants changed the password to the Plaintiff's Microsoft account, added security information for "Janylyn@builtbylogic.com," and then deleted the security information for "Janylyn@buffalolumber.com." Copies of the alerts from the Plaintiff's Microsoft team documenting the above changes are attached to this *Complaint* as Exhibit XI.

40. The Defendants' actions are also preventing the Plaintiff from accessing its Google Analytics database, due to a lack of administrative access. This prohibits the Plaintiff from adding or adjusting specific conversion goals and, thereby, enhance its analytics tracking abilities.

41. Most importantly, the Defendants are preventing the Plaintiff from gaining the necessary access to its Domain Name, its file transfer protocol, or its website hosting platform. This prohibits the Plaintiff from performing routine maintenance or implementing improvements within the website – its primary source for generating revenue.

42. The Plaintiff's online presence is paramount to its overall business, and the Defendants' actions impair the Plaintiff's ability to effectively control its technical operations and has exploited her position of authority for her own personal gain.

43. Further, Defendant Marks – should she so desire – maintains the ability to continue to prevent the Plaintiff from accessing or controlling the Domain Names, the Plaintiff's website hosting and analytics platforms, and its advertising platforms until compelled to do otherwise.

44. The Plaintiff is presently powerless to compel the Defendants to provide it with any access or control.

45. All of Defendant Marks's statements and actions evidence an intent to interfere with the Plaintiff's business by withholding access to the Domain Names, the

Plaintiff's website hosting and analytics platforms, and its advertising platforms in order to obtain a ransom for their return.

46. By "setting the stage" for her future exploitation of the Domain Names, the Plaintiff's website hosting and analytics platforms, and its advertising platform, Defendant Marks acted in bad faith, contrary to the Plaintiff's best interest and, thus, violated her fiduciary duty as a Director and President of the Plaintiff.

## COUNT I:
### VIOLATION OF THE ANTI-CYBERSQUATTING CONSUMER PROTECTION ACT

1. Plaintiff repeats and realleges all paragraphs above, as if fully set forth herein.

2. The Plaintiff is entitled to recover under a claim for violation of the ACPA by the Defendants.

3. Under the ACPA, "a person shall be liable in a civil action by the owner of a mark… if… that person:

   (i) has a bad faith intent to profit from that mark; and

   (ii) registers, traffics in, or uses a domain name that – (I) in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark."[4]

4. Since its founding, the Plaintiff has utilized "Buffalo Lumber" and "Buffalo Lumber Company" in the marketplace to identify and distinguish its goods and to indicate the source of those goods.

---

[4] 15 U.S.C. § 1125(d)(1)(A)

5. The Plaintiff was the first to use said marks in the marketplace.

6. On January 13, 2006, Defendant Marks – acting on behalf of the Plaintiff – registered the trademark: "Buffalo Lumber Co" with the United States Patent and Trademark Office. A copy of the relevant information regarding this trademark – obtained directly from the United States Patent and Trademark Office – is attached to this *Complaint* as Exhibit XII.

7. On the trademark application, Defendant Marks indicated that the Plaintiff was the rightful owner of the trademark.

8. The registration fee for the Domain Names was paid by the Plaintiff and – since registration – the Plaintiff has paid to renew the registration and maintain the Domain Names over the last 15 years.

9. The Plaintiff also paid for all other services associated with the Plaintiff's website hosting and analytics platforms, and its advertising platforms over the same period.

10. This trademark was inherently distinctive at the time of registration and remains as such.

11. The Domain Names at issue are directly identical to the trademark Defendant Marks presented to the domain name registrar on the application and remain as such.

12. In determining whether a person has a bad faith intent, this Court may consider factors such as, but not limited to:

    (i) The trademark of the Plaintiff is in the domain name;

(ii) The domain name consists of the name that is commonly used to refer to the Plaintiff;

(iii) The Plaintiff has previously used the domain name in connection with its bona fide offerings of goods and services throughout the duration of its business, while the Defendant has never actually used the site in connection with the bona fide offer of goods or services;

(iv) The Defendant has never attempted a bona fide non-commercial or fair use of the mark in a site accessible under the domain name;

(v) The Defendant has offered to transfer, sell, or otherwise assign the domain name to the Plaintiff for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services;

(vi) The fact that the Plaintiff's mark that is incorporated in the domain name is distinctive.[5]

13. Here, Defendant Marks registered the Domain Names that are identical to a registered trademark held by the Plaintiff, and now she is attempting to profit by ransoming them back to the Plaintiff.

14. Defendant Marks did not believe and could not have had reasonable grounds to believe that the use of the Domain Names was a fair or otherwise lawful use.

15. Pursuant to the ACPA, this Court may order the transfer of the Domain Names to the Plaintiff, as the owner of the mark.[6]

---

[5] 15 U.S.C. § 1125(d)(1)(B)
[6] *See* 15 U.S.C. § 1125(d)(1)(C)

16. The Plaintiff's technical operations are still being disrupted by the Defendants, and it is still under threat of serious damage to its ongoing recruitment efforts and goodwill.

17. Without the issuance of an immediate temporary restraining order, the Domain Names, the Plaintiff's website hosting and analytics platforms, and its advertising platforms remain entirely within the control of the Defendants, and are subject to modification, removal, and destruction.

18. The Plaintiff requires this technology to operate and is likely to suffer irreparable harm to its business reputation and goodwill given that the Defendants control essential features of the Plaintiff's business.

19. Further, imposition of the aforementioned remedy upon the Defendants is necessary to protect the Plaintiff – an American business – and to promote the growth of online commerce.

20. Any notice whatsoever to the Defendants prior to the request and issuance of an *ex parte* temporary restraining order will jeopardize the business operations, professional reputation, and business relationships of the Plaintiff.

## COUNT II:
### BREACH OF FIDUCIARY DUTY

21. Plaintiff repeats and realleges all paragraphs above, as if fully set forth herein.

22. The Plaintiff is entitled to recover under a claim for breach of fiduciary duty by Defendant Marks.

23. To make out a claim for breach of a fiduciary duty, a plaintiff must show:

(i)    a fiduciary relationship,

(ii)   breach of the resulting fiduciary duty, and

(iii)  injury to the plaintiff or benefit to the defendant as a result of that breach.[7]

24.   As the Director of the Plaintiff's technical staff – and its eventual president, Defendant Marks was at all times relevant to this *Complaint* bound by a fiduciary duty to the Plaintiff, pursuant to T.C.A.§ 48-18-301.

25.   A director shall discharge all duties as a director:

(i)    in good faith;

(ii)   with the care an ordinarily prudent person in a like position would exercise under similar circumstances; and

(iii)  in a manner the director reasonably believes to be in the best interests of the corporation.[8]

26.   Further, as an officer with discretionary authority, Defendant Marks was at all times relevant to this *Complaint* bound by a fiduciary duty to the Plaintiff, pursuant to T.C.A. § 48-18-403.

27.   An officer with discretionary authority shall discharge all duties under that authority:

(i)    in good faith;

(ii)   with the care an ordinarily prudent person in a like position would exercise under similar circumstances; and

---

[7] <u>Ann Taylor Realtors, Inc. v. John N. Sporup, et al.</u>, 2010 WL 4939967 at *3 (Tenn.Ct.App. 2010).
[8] Tenn. Code Ann. § 48-18-301

(iii) in a manner the officer reasonably believes to be in the best interest of the corporation.[9]

28. By "setting the stage" for her future exploitation of the Domain Names, the Plaintiff's website hosting and analytics platforms, and its advertising platform, Defendant Marks acted in bad faith, contrary to the Plaintiff's best interest and, thus, violated her fiduciary duty as a Director and President of the Plaintiff.

29. Defendant Marks acted to impair the Plaintiff's ability to effectively operate its business, exploiting her control over its online presence for her own personal gain.

30. Defendant Marks should have transferred access to and control over the Domain Names to the Plaintiff prior to her departure.

31. Instead, Defendant Marks retained sole access and control following her departure, formed her own separate business entity, and then transferred said access and control to this third-party and away from the Plaintiff.

32. The Plaintiff has been damaged by Defendant Marks's wrongful disposition of the Domain Names, the Plaintiff's website hosting and analytics platforms, and its advertising platforms through this denial of access, use, and control.

33. The Plaintiff has had difficulty attracting new customers and interacting with existing ones, as well as retaining some continuity of its technical operations.

### COUNT III:

---

[9] Tenn. Code Ann. § 48-18-403

## CONVERSION

34. Plaintiff repeats and realleges all paragraphs above, as if fully set forth herein.

35. The Plaintiff is entitled to recover under a claim for conversion by the Defendants.

36. The domain names are considered intangible property that are protected by the tort of conversion because the Plaintiff had a "well-defined interest" in them and a legitimate claim to exclusivity over them.[10]

37. To establish a claim for conversion, a plaintiff must show:

    (i)   the appropriation of another's property to one's own use and benefit,

    (ii)  by the intentional exercise of dominion over it,

    (iii) in defiance of the true owner's rights.[11]

38. Here, the Defendants unlawfully converted the Domain Names by revising the domain name registration information to effectuate the transfer of ownership of the Domain Names from the Plaintiff to the Defendant.

39. By doing so, the Defendants appropriated the property of the Plaintiff for their own use and benefit and intentionally exercised dominion over it in defiance of and interference with the Plaintiff's rights as the true owner.

40. The Defendants wrongfully disposed this property from the Plaintiff.

---

[10] *See* Kremen v. Cohen, 337 F.3d 1024, 1030 (9th Cir.2003).
[11] Hanna v. Sheflin, 275 S.W.3d 423, *9 (Tenn.Ct.App. 2018) (citing Kinnard v. Shoney's, Inc., 100 F. Supp. 2d 781, 797 (M.D Tenn. 2000); Mammoth Cave Prod. Credit Ass'n v. Oldham, 569 S.W.2d 833, 836 (Tenn.Ct.App. 1977)).

41. The Defendants control the Plaintiff's domain name through their own accounts but has refused to return them. Instead, they insist that the Plaintiff continue to pay them for their services if the Plaintiff wishes to access the accounts.

42. The Defendants are currently listed as the administrator on the accounts and, as a result, the Plaintiff cannot access them.

43. The Plaintiff has been damaged by the Defendants' wrongful disposition of the Domain Names, the Plaintiff's website hosting and analytics platforms, and its advertising platforms through this denial of access, use, and control.

44. The Plaintiff has had difficulty attracting new customers and interacting with existing ones, as well as retaining some continuity of its technical operations.

45. The Defendants retain full control of the Domain Names, the Plaintiff's website hosting and analytics platforms, and its advertising platform, and the Plaintiff is being completely denied access or control.

46. The Plaintiff's technical operations are still being disrupted by the Defendants, and it is still under threat of serious damage to its ongoing recruitment efforts and goodwill.

47. Without the issuance of an immediate temporary restraining order, the Domain Names, the Plaintiff's website hosting and analytics platforms, and its advertising platforms remain entirely within the control of the Defendants, and are subject to modification, removal, and destruction.

48. The Plaintiff requires this technology to operate and is likely to suffer irreparable harm to its business reputation and goodwill given that the Defendants control essential features of the Plaintiff's business.

49. Any notice whatsoever to the Defendant prior to the request and issuance of an *ex parte* temporary restraining order will jeopardize the business operations, professional reputation, and business relationships of the Plaintiff.

**COUNT IV:**

**BREACH OF CONTRACT**

50. Plaintiff repeats and realleges all paragraphs above, as if fully set forth herein.

51. The Plaintiff is entitled to recover under a claim for breach of contract by the Defendant.

52. To establish a claim for breach of contract, a plaintiff must show:

   (i) the existence of an enforceable contract,

   (ii) nonperformance amounting to a breach of that contract, and

   (iii) damages caused by the breach of that contract.[12]

53. The Plaintiff, Defendant Marks, and Built by Logic entered into the Subcontractor Agreement on December 14, 2017, which is a valid enforceable contract.

---

[12] *See* Custom Built Homes v. G.S. Hinsen Co., Inc., 1998 WL 960287 (Tenn.Ct.App 1998) (citing Life Care Ctrs. Of Am., Inc. v. Charles Town Assoc's. Ltd. Partnership, LPIMC, Inc., 79 F.3d 496, 514 (6th Cir. 1996).

54. Pursuant to the Subcontractor Agreement, the Defendants have an obligation to work with the Plaintiff to:

(i)  provide financial analysis,

(ii)  maintain its website and guarantee superior performance, and

(iii)  assist with marketing and lead generation.

55. The Defendants assured the Plaintiff that she would monitor the Plaintiff's website "to ensure uninterrupted service."

56. The Defendants breached the Subcontractor Agreement on November 17, 2021, when they withheld access to and control of the Domain Names, the Plaintiff's website hosting and analytics platforms, and its advertising platform.

57. The Defendants maintain control over the Domain Names, the Plaintiff's website hosting and analytics platforms, and its advertising platforms through her own accounts and has refused to return them.

58. The Defendants are listed as the administrator on the accounts and, as a result, the Plaintiff cannot unilaterally access them.

59. The Defendants insist that the Plaintiff continue to pay them for their services if the Plaintiff wishes to access the accounts.

60. The Plaintiff has been damaged by the Defendants' wrongful disposition of the Domain Names, the Plaintiff's website hosting and analytics platforms, and its advertising platforms through this denial of access, use, and control.

61. The Plaintiff has had difficulty attracting new customers and interacting with existing ones, as well as retaining some continuity of its technical operations.

## COUNT V:

### TORTIOUS INTERFERENCE WITH A BUSINESS

62. Plaintiff repeats and realleges all paragraphs above, as if fully set forth herein.

63. The Plaintiff is entitled to recover under a claim for tortious interference with a business by the Defendants.

64. The Plaintiff has the right to establish and conduct a lawful business and is entitled to the protection of this Court when that right is unlawfully invaded by the Defendants.[13]

65. To establish a claim for tortious interference with a business, a plaintiff must show:

   (i) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons;

   (ii) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general;

   (iii) the defendant's intent to cause the breach or termination of the business relationship;

   (iv) the defendant's improper motive or improper means; and

   (v) damages resulting from the tortious interference.[14]

---

[13] See Trau-Med of America, Inc. v. Allstate Ins. Co., 71 S.W.3d 691, *698 (Tenn. 2002) (quoting Hutton v. Watters, 179 S.W. 134, *135 (Tenn. 1915).

[14] See Trau-Med of America, Inc. v. Allstate Ins. Co., 71 S.W.3d 691, *701 (Tenn. 2002) (citing Top Serv. Body Shop, 582 P.2d 1365, 1371 (Or. 1978).

66. The Plaintiff's online presence has become its primary means of generating sales and maintaining its relationships with customers.

67. As a former Director and then President, Defendant Marks is intimately familiar with the Plaintiff's business, as well as its technical operations.

68. Defendant Marks is now using her close personal knowledge of the Plaintiff in a concerted effort to undermine its existing and prospective customer relationships with an intent to cause breach or termination of the business relationship.

69. The Defendants grossly overreached by intentionally intermeddling with the technical operations and business affairs of the Plaintiff, without any legitimate interest, violating the ethical standards of a competitive marketplace.

70. The Defendants' conduct was intentional and without legal justification; it was malicious and, therefore, it is actionable.[15]

71. The Defendants utilized improper motives and improper means because their interference is wrongful by reason of federal and Tennessee law, as well as an established standard of the Plaintiff's profession.

72. The Defendants should be held responsible for interfering in the non-contractual business relationships of the Plaintiff, with motives or means that are contrary to those used to further lawful competitive business practices.[16]

---

[15] *See* Trau-Med of America, Inc. v. Allstate Ins. Co., 71 S.W.3d 691, *698 (Tenn. 2002) (quoting Hutton v. Watters, 179 S.W. 134, *135 (Tenn. 1915).
[16] *See* Trau-Med of America, Inc. v. Allstate Ins. Co., 71 S.W.3d 691, *698 (Tenn. 2002) (citing Hutton v. Watters, 179 S.W. 134 (Tenn. 1915).

73. The Plaintiff has been damaged by the Defendants' wrongful disposition of the Domain Names, the Plaintiff's website hosting and analytics platforms, and its advertising platforms through this denial of access, use, and control.

74. The actions of the Defendants were harmful to the Plaintiff by inhibiting its ability to properly maintain its technical operations and, thereby, attract new customers and interact with existing ones.

75. The Plaintiff relies heavily on its technical operations to function effectively, and it has suffered irreparable harm to its business reputation and goodwill given that the Defendants have disrupted essential features of its business.

76. Without the issuance of an immediate temporary restraining order, the Domain Names, the Plaintiff's website hosting and analytics platforms, and its advertising platforms remain entirely within the control of the Defendants, and are subject to modification, removal, and destruction.

77. Any notice whatsoever to the Defendants prior to the request and issuance of an *ex parte* temporary restraining order will jeopardize the business operations, professional reputation, and business relationships of the Plaintiff.


WHERFORE, the Plaintiff requests:

I. That the Defendant be required to respond to this Complaint within the time provided by law;

II. That this cause be tried by a jury;

III. That judgment for the Plaintiff enter against the Defendants on each count;

IV.   That Plaintiff be awarded compensatory damages in the amount of $5,000,000.00;

V.    That this Court grant an immediate *ex parte* Temporary Restraining Order pursuant to Fed. R. Civ. P. 65, restraining the Defendants as set forth in the accompanying *Motion for Temporary Restraining Order and Preliminary Injunction*;

VI.   That this Court, upon notice and hearing to the Defendants, enter a preliminary injunction pursuant to Fed. R. Civ. P. 65, enjoining them as set forth in the accompanying *Motion for Temporary Restraining Order and Preliminary Injunction*;

VII.  That, upon final hearing, this Court enter a permanent injunction against the Defendants for all acts and omissions sought to be enjoined in the accompanying *Motion for Temporary Restraining Order and Preliminary Injunction*.

VIII. For such other and general relief that this Court deems just and appropriate under the facts and circumstances of this case.


Respectfully submitted,


*/s/ Wesley Clark*
Wesley Clark, #32611
Frank Brazil, #34586
**Brazil Clark, PLLC**
2901 Dobbs Avenue
Nashville, TN 37211
615-730-8619
615-634-3651 (FAX)
wesley@brazilclark.com

frank@brazilclark.com

## DECLARATION UNDER PENALTY OF PERJURY
### 28 U.S.C. § 1746

I am Shelia Barthel. I am over eighteen (18) years of age and competent to testify in this matter. I am the current Director for the Plaintiff, Buffalo Lumber Company, Inc., and I declare under penalty of perjury that all statements above are true and correct, to the best of my knowledge, information, and belief.

_Shelia Barthel_  Shelia Barthel

1/4/22  Date

Page 25 of 25